UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CITIZENS ACTION COALITION OF INDIANA, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-422-RLY-DKL |
| | ) | |
| TOWN OF YORKTOWN, INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Citizens Action Coalition of Indiana, Inc. ("CAC"), brings this action

against the Town of Yorktown, Indiana, ("Yorktown" or "Town") challenging the

constitutionality of several provisions of Ordinance No. 688, which has subsequently

been amended and superseded by Ordinance No. 710 (the "Ordinance") during the course

of this litigation. After this amendment, the only remaining constitutional challenge

involves whether the prohibition of door-to-door canvassing and solicitation after the

hour of 9:00 p.m. or sunset, whichever is earlier, comports with the First Amendment.

Both parties have moved for summary judgment with respect to this issue. The court,

having reviewed all briefing and applicable law, now **GRANTS** CAC's motion for

summary judgment and **DENIES** the Town's motion for summary judgment.

**I.      Background**

Yorktown is a small, semi-rural residential community located in Delaware

County, Indiana, directly contiguous to the City of Muncie. (Deposition of Pete Olson

("Pete Olson Dep.") 8:20-9:3). The Town is inhabited by approximately 14,300 people, living in 3,500 residences. (*Id*. at 8:4-10, 9:4-19).

The legislative body for the Town is the Yorktown Town Council. (Pete Olson Dep. 11:7-9). Pete Olson serves as the Town Manager. (*Id*. at 6:5-15). The Yorktown Town Council contains seven (7) elected members whose responsibilities include passing ordinances to govern the Town, such as the Ordinance at issue here. (*Id*. at 11:7-19).

## A. The Ordinance

### 1. Relevant Provisions

CAC originally brought this lawsuit in response to Ordinance No. 688, which was passed by the Yorktown Town Council on February 27, 2012, and took effect 30 days later in April of 2012. (*Id*. at 14:20-15:12). Due to this lawsuit, the Town amended Ordinance 688 and replaced it with Ordinance 710. (*Id*. at 18:11-18). The new ordinance was passed unanimously by the Yorktown Town Council on June 17, 2013, and took effect immediately. (*Id*. at 18:19-19:9).

The Ordinance regulates the ability of persons to peddle, solicit, or fundraise door-to-door. (Yorktown Codified Ordinance § 688). The Ordinance sets forth regulations and restrictions for a person classified as a: (1) non-commercial door-to-door advocate, (2) peddler, (3) professional fundraiser, (4) solicitor, or (5) transient merchant. (Yorktown Codified Ordinance§ 688.01[1]). The Town considers CAC's activities to be

---

[1] Ordinance 710 contains chapter headings which are denominated as "§ 688.01" through "§ 688.12."

those of a non-commercial door-to-door advocate.  (*See* Affidavit of Pete Olson ("Pete

Olson Aff.) ¶ 10).  A non-commercial advocate is defined by the Ordinance as follows:

> A person who goes door-to-door for the purposes of disseminating
> religious, political, social or other ideological beliefs, and includes any
> person who canvasses or distributes pamphlets or other written intended for
> non-commercial purposes.  Requests for donations to directly support the
> non-commercial purpose of disseminating religious, political, social or
> other ideological beliefs and which are incidental to such advocacy shall be
> considered non-commercial solicitation.  This includes any person who
> canvasses or distributes pamphlets or other written information intended for
> non-commercial purposes.

(Yorktown Codified Ordinance § 688.01).  For all non-commercial advocates, including

CAC, the Ordinance contains no registration requirement, no identification requirement,

and no fee or license requirement.  (Yorktown Codified Ordinance § 688.02; Pete Olson

Dep. 27:21-28:3).

> The parties' dispute centers on § 688.09 of the Ordinance, which provides:

> It is unlawful for any person to peddle, solicit or fundraise before the hour
> of 9:00 a.m. of any day or after the hour of 9:00 p.m. (or sunset, whichever
> is earlier) of any day without the specific prior consent of the prospective
> buyer.

(Yorktown Codified Ordinance § 688.09 ("Hours Restriction")).  The Hours Restriction

applies to everyone under the Ordinance, including non-commercial advocates, whether

or not they are required to obtain a license.  (Pete Olson Aff. ¶ 11).  A person who

violates this restriction "shall, upon conviction, be subject to a fine not exceeding $2,500.

A separate offense shall be deemed committed upon each day during which a violation

occurs or continues."  (Yorktown Codified Ordinance § 10.99).

In practice, the end time of the Hours Restriction is typically guided by the time of sunset. For almost three (3) months of 2013 (the beginning of November through January), sunset occurred before 6:00 p.m. (*See* Pl.'s Ex. 5, Sunset Tables[2]). Indeed, sunset occurred as early as 5:16 p.m. on December 3, 2013 through December 12, 2013. (*Id*.). For almost five (5) months of 2013 (mid-October through early March), sunset occurred before 7:00 p.m., and for over six (6) months of 2013 (mid-September to late March), sunset occurred before 8:00 p.m. (*Id*.). On the other hand, sunset occurred after 9:00 p.m. only 63 days in 2013. (*Id*.).

### 2. Reasons for the Ordinance

The Yorktown Town Council passed the Ordinance for two primary reasons: (1) privacy interests of its residents, and (2) safety concerns voiced by its residents. (Pete Olson Dep. 31:23-32:11). Residents stated that they were apprehensive about canvassers approaching their homes after dark. (*Id*. at 32:12-33:11). Most of their fears stemmed from the fact that many of the Town's subdivisions were built far apart, lack sidewalks, and, contain few streetlights. (*Id*. at 36:7-37:17). Although new subdivisions in the Town now must go through a zoning process that requires sidewalks and streetlights, only three to five subdivisions of the approximately twenty-five (25) subdivisions meet those requirements. (*Id*. at 40:4-24). Residents also noted that they value their privacy, and prefer not being interrupted during the evening hours. According to the Town

---

[2] Both parties reference the sunrise and sunset times listed by the United States Naval Observatory. The court finds this data is not subject to reasonable dispute and thus takes judicial notice of these times. *See, e.g., Pryor v. City of Chicago*, No. 07-C-2479, 2010 WL 431470, at * 2 (N.D. Ill. Feb. 1, 2010) (taking judicial notice of sunset).

Manager, these concerns stem from the fact that the Town's residents are "coming home from the grind, trying to take care of the kids, [and] putting them to bed . . . ." (*Id.* at 37:25-38:17). That said, the Town did not have any complaints or concerns involving fraud or any other illegal activities by persons going door-to-door. (*Id.* at 43:2-7, 44:14-16).

## B.     CAC

CAC is an Indiana non-profit organization dedicated to promoting and preserving the rights of Indiana citizens on issues such as utility rate-making and regulations, health care, environmental well-being, and political participation. (Affidavit of Kerwin Olson ("K. Olson Aff.") ¶ 3; Affidavit of Laura Sucec ("Sucec Aff.") ¶ 3). CAC has operated continuously in Indiana since 1974 and currently has approximately 40,000 members. (K. Olson Aff. ¶ 3). Currently, CAC's only office is located in Indianapolis, Indiana. (*Id.* at ¶ 4; Sucec Aff. ¶ 4).

### 1.     Canvassing

CAC's funding stream is severely limited, so it relies on contributions from supporters to advance its mission. (K. Olson Aff. ¶ 4; Sucec Aff. ¶ 4). In particular, CAC engages in "canvassing" operations, which involves making direct contact with potential supporters. (K. Olson Aff. ¶ 5; Sucec Aff. ¶ 5). This is done in two ways: (1) "field canvassing," which involves canvassers going door-to-door in Indiana's cities and towns to engage willing listeners, and (2) "phone canvassing," in which canvassers call persons on the telephone. (K. Olson Aff. ¶ 5; Sucec Aff. ¶ 5). CAC has conducted field

canvassing in Indiana since 1980 and phone canvassing since 1982. (K. Olson Aff. ¶ 5; Sucec Aff. ¶ 5).

During CAC's field canvassing, its employees go door-to-door in residential neighborhoods to speak to citizens about issues of public and political importance. (K. Olson Aff. ¶ 6). During this time, CAC will distribute informational literature, ask residents to sign a petition, and solicit monetary contributions to CAC. (*Id*.). CAC does not sell or offer for sale any goods, merchandise, or services. (Sucec Aff. ¶ 7). These conversations typically last 10 to 15 minutes but may last as long as 30 to 45 minutes. (*Id*. at ¶ 8). Through these actions, CAC spreads its message while obtaining financial support to continue its operations. (K. Olson Aff. ¶ 6).

CAC generates approximately 25% of its annual revenues from field canvassing and an additional 30-35% through phone canvassing. (K. Olson Aff. ¶ 8). Despite more money raised through phone canvassing, CAC believes field canvassing is far more successful and vital to its operations. (*Id*. at ¶ 7). Advantages include: (1) the natural back-and-forth discussion that occurs during a face-to-face interaction; (2) the ability to distribute literature and obtain signatures on petitions; and (3) the chance to identify supporters and likely supporters who may then be contacted through phone canvassing. (*Id*.; Sucec Aff. ¶ 10).

CAC engages in field canvassing in each respective municipality approximately once every twelve (12) or eighteen (18) months. (Sucec Aff. ¶ 13). It will continue canvassing the municipality until it has visited the majority of a particular city or town. (*Id*.). But for municipalities that are located outside the immediate vicinity of

Indianapolis, CAC generally does not canvass those areas on consecutive days, so that its employees can be relieved from lengthy travel. (*Id*.). Instead, CAC will visit the municipality once or twice a week until it has completed canvassing there. (*Id*.).

CAC typically conducts its field canvassing activities between 4:00 p.m. and 9:00 p.m. on weekdays year-round. (*Id*. at ¶ 14). CAC will occasionally canvass on Saturdays from 11:00 a.m. to 4:00 p.m., but it generally only does this to make up time missed during the weekdays for holidays or extreme weather. (*Id*. at ¶ 14). CAC believes that it is essential to canvass between 7:00 p.m. and 9:00 p.m. during weeknights because, between those two hours, most people are home and willing to listen, sign petitions, and make contributions. (*Id*. at ¶ 15; K. Olson Aff. ¶ 11). Indeed, data collected between April and October 2013 shows that almost 50% of all donations made to CAC through field canvassing operations were made after 7:00 p.m. (Sucec Aff. ¶ 16). Moreover, due to the travel from Indianapolis required for canvassers, it is not a good use of CAC's time and money to travel to municipalities that are two or three hours away from Indianapolis unless CAC's canvassers are allowed to canvass for a full five hour (4 p.m. to 9 p.m.) period. (*Id*. at ¶ 17). Because of this, CAC wishes to engage in field canvassing in the Town from 4:00 p.m. to 9:00 p.m., as it does in the rest of Indiana, for all months of the year. (Sucec Aff. ¶ 24; K. Olson Aff. ¶ 12).

### 2. Training

CAC provides instruction to its canvassers on how to engage in field canvassing safely. (Sucec Aff. ¶ 9, Ex. 2). Specifically, CAC advises canvassers to avoid walking in the streets, if possible, and to carry a flashlight after dark. (*Id*.). In addition, as a

courtesy to the town it will be canvassing, CAC typically provides a list of the canvassers' names, dates of birth, and last four digits of the canvassers' social security numbers to the local police department. (*Id*. at ¶ 12). CAC also provides local officials with the license plate numbers of its canvassers' vehicles and a letter that generally describes CAC's activities and procedures. (*Id*.).

### 3. Lobbying

CAC maintains an active lobbying presence in front of the Indiana General Assembly ("Assembly"). (K. Olson Aff. ¶ 9). Many of the issues that CAC discusses with residents during its canvassing activities are issues that are pending before, or are likely to pend before, the Assembly. (Sucec Aff. ¶ 11). Specifically, CAC will seek support for legislative proposals, obtain signatures on petitions to be presented to the legislature, and encourage residents to contact their elected officials regarding proposed legislation. (K. Olson Aff. ¶ 10). The Assembly is in session from early January to mid-March in even-numbered years, and from January to mid-April in odd-numbered years. (*Id*. at ¶ 9). In both sessions, decisions are made in December and early January about the introduction, amendment, and advancement of proposed legislation. (*Id*.). As a result, CAC's ability to engage in field canvassing during the winter months is essential to its operations and advocacy efforts. (*Id*. at ¶ 10; Sucec Aff. ¶ 11).

### C. CAC's Field Canvassing in the Town

CAC engaged in field canvassing in the Town in February 2010 and November 2011. (Sucec Aff. ¶ 19). During this time, residents engaged in conversations with CAC, signed petitions, and made financial contributions to CAC. (*Id*. at ¶ 20). During

CAC's most recent trip, the Town requested that CAC have its canvassers check in with the Town's police department each afternoon before canvassing the area. (*Id*. at ¶ 21). Few other cities or towns in Indiana have made a similar request. (*Id*.). On February 21, 2013, CAC sent a letter to the Town to alert it that it would be canvassing there. (*Id*. at ¶ 22). The Town responded with a handwritten facsimile that included a copy of the Ordinance, which stated the following:

> Please note effective 2/27/12 changes to ordinance No. 688 including –
> 150.00 – initial application fee
> 50.00 – per person per week
> Permit good for 1 week only (some fees apply for renewal)
> Hours for permit 9:00 am – 8:00[3] pm or dusk, whichever is earlier
> Any questions call 765-759-8521

(*Id*.; Sucec Aff., Ex. 4). After receiving the facsimile, CAC decided not to canvass the Town. (*Id*. at ¶ 23).

On March 14, 2013, CAC filed the present Complaint against the Town.

## II.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine dispute as to a material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

---

[3] It is not clear from the record why the permit limited evening canvassing to 8:00 p.m. or dusk, rather than 9:00 p.m. or sunset.

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which the movant believes demonstrates an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met his burden, the nonmoving party may not rest upon mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. In determining whether a genuine issue of material fact exists, the court must view the facts "in the light most favorable to the nonmoving party and all reasonable inferences are drawn in her favor." *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

The parties filed cross-motions for summary judgment, but this neither alters the applicable standard nor implies there are no genuine issues of material fact. *R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers,* 335 F.3d 643, 647 (7th Cir. 2003). Rather, in determining whether genuine and material factual disputes exist, the court reviews the parties' respective memoranda and supporting affidavits and exhibits, and construes all facts and reasonable inferences in a light most favorable to the respective non-movant. *IPofA W. 86th St. 1, LLC v. Morgan Stanley Mortg. Capital Holdings, LLC*, No. 1:09-cv-0573, 2011 WL 3021578, at *2 (S.D. Ind. July 21, 2011).

## III.    Discussion

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. Amend. I. The United States Supreme Court has long recognized substantial First Amendment protection for door-to-

door soliciting, canvassing, and pamphleteering.  *See, e.g., Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 160 (2002); *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1550 (7th Cir. 1986) *aff'd,* 479 U.S. 1048 (1987); *Wisconsin Action Coalition v. City of Kenosha,* 767 F.2d 1248, 1251 (7th Cir. 1985).  This right, however, is not absolute.  Municipalities may impose time, place, and manner restrictions on solicitors, canvassers, and pamphleteers "so long as the regulation is in furtherance of a legitimate governmental objective."  *Watseka*, 796 F.2d at 1550.

"To sustain a time, place, and manner restriction on First Amendment activities, the government must establish that the restriction: (1) is content-neutral, (2) serves a legitimate governmental objective, (3) leaves open ample alternative channels of communication, and (4) is narrowly tailored to serve the governmental objective." *Watseka*, 796 F.2d at 1552; *Weinberg v. City of Chicago*, 310 F.3d 1029, 1037 (7th Cir. 2002).  The Town, as the proponent of an ordinance that allegedly infringes upon CAC's First Amendment rights, has the burden of establishing the statute is constitutional. *Watseka*, 796 F.2d at 1551.

The parties do not dispute the first two prongs, as they agree the Ordinance is content-neutral and the Town's objectives – privacy of residents, safety of residents, and safety of canvassers – are all legitimate government objectives.  Thus, the court focuses on whether the Ordinance's Hours Restriction is narrowly tailored to serve these governmental objectives while also leaving open ample alternative channels of communication.

## A. Narrowly Tailored to Serve the Governmental Objective

A government regulation is considered narrowly tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *Weinberg*, 310 F.3d at 1040. Although the regulation need not be a perfect fit for the government's needs, it cannot burden substantially more speech than necessary. *Id*. Indeed, "a time, place or manner restriction need not be the least restrictive means of achieving the government purpose, so long as it can be considered narrowly tailored to that purpose." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (citing *Ward*, 491 U.S. at 798-99)).

The Town argues the Ordinance furthers the Town's legitimate interest in protecting the privacy of its citizens, including the quiet enjoyment of their homes. The Town originally advanced two other interests: (1) protecting the safety of its residents, and (2) protecting the safety of pedestrian canvassers. Although the Town appears to have abandoned these interests, several of the Town's affiants allude to these interests. Accordingly, the court, in an abundance of caution, will address these interests too.

### 1. Privacy of Residents

The Town's interest in "protecting the privacy of its citizens, including the quiet enjoyment of their homes," is a legitimate government interest. *Watseka*, 796 F.2d at 1550; *see also Watchtower Bible*, 536 U.S. at 165. The Town argues that the Ordinance is narrowly tailored to secure its residents' privacy because it reduces the "likelihood of intrusions into [the residents'] domestic privacy after dark." The Town submits affidavits

from residents who express apprehension and fear at the thought of canvassers knocking on their doors after dark, (*See, e.g.,* Affidavit of Bob Drummond ("Drummond Aff.") ¶ 7 (Town resident who testified, "Although I do not mind people coming to my door during daylight hours when I expect people to be out, if someone approaches my house in the dark, or if my doorbell rings after dark, it alarms me."); Affidavit of Erin Hurley ("Hurley Aff.") ¶ 6 (same); Affidavit of Brendon Comp ("Comp Aff.") ¶ 7 (same); Affidavit of Eric Baize ("Baize Aff.")¶ 8 (same); Affidavit of Mark Stagge ("Stagge Aff.") ¶ 8 (same)). CAC submits an affidavit from Laura Sucec, the Senior Canvass Director of CAC. She testified she canvassed the Town in 2011 and found many residents were excited to engage in conversations with her and donate to CAC's cause. (Sucec Aff. ¶ 20). At best, the evidence shows that some of the Town's residents are receptive to CAC's message, and some are not. The court therefore finds that a complete ban of evening solicitation is not narrowly tailored to achieve the Town's legitimate interest in the privacy of its residents, particularly where, as here, the unwilling listener's interest could be easily accommodated. *See Watseka*, 796 F.2d at 1556 ("To support the restrictions on this ground [of annoyance] is to derogate the First Amendment rights of plaintiffs and those of defendants' residents who would be willing recipients of plaintiffs' message during the evening hours to the nuisance concerns of those of their residents who would not be willing listeners during those hours, when the wishes of both groups can be easily accommodated.").

For example, the Town Council could include non-commercial advocates in the list of persons to whom a "No Peddlers or Solicitors " sign  is applicable. (*See* Yorktown

Codified Ordinance § 688.11) (stating it is unlawful for a peddler, solicitor or fundraiser to approach the door of a residence with such a "No Peddlers or Solicitors" sign). In addition, an unwilling listener can simply refuse to answer the door.

Courts have regularly found that such less restrictive means are sufficient for invalidating an ordinance. For example, in *Watchtower Bible*, the city argued that its ordinance requiring individuals to first obtain a permit before engaging in door-to-door soliciting was narrowly tailored to protecting the privacy of residents. In finding that the ordinance violated the First Amendment, the Supreme Court stated that the ability to post a "No Solicitation" sign "coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener." 536 U.S. at 168; *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 639 (1980) ("[T]he provision permitting homeowners to bar solicitors from their property by posting [no solicitation] signs . . . suggests the availability of less intrusive and more effective measures to protect privacy."). Similarly, in *Watseka*, the city argued that the 5 p.m. to 9 p.m. ban on solicitation Monday through Saturday had a significant relationship to protecting the quiet enjoyment and peace of its residents. 796 F.2d at 1556. The Seventh Circuit disagreed, finding residents could already protect themselves by simply posting a "No Solicitation" sign, so the ban was "essentially an attempt by [the city] to substitute its judgment for that of its citizens." *Id*. These less restrictive alternatives show the Town can effectively combat the interest of protecting the residents' privacy without a broad prohibition on canvassing after sunset.

Accordingly, the Ordinance is not narrowly tailored to serve the Town's legitimate interest in protecting its residents' privacy.

Relatedly, the Town appears to argue that its privacy interests are heightened because, in addition to advocating and educating the Town's residents on matters of public import, CAC also seeks voluntary contributions. The Town's argument flows from the premise that "when a solicitation involves money . . . more regulation is constitutionally tolerable." The court does not find the Town's argument persuasive, as the Hours Restriction applies regardless of whether a canvasser also seeks voluntary contributions. Moreover, the case the Town cites in support of that proposition, *Watchtower Bible, supra.*, noted that the regulatory concern regarding the solicitation of money is the potential for fraud. 536 U.S. at 162-63 (citing *Cantwell v. Connecticut*, 310 U.S. 296 (1940)). The Town has not advanced the prevention of fraud as a justification for the Hours Restriction. Accordingly, the court rejects the Town's argument.

### 2. Safety of Residents

"Another legitimate municipal objective which will justify a properly drawn solicitation ordinance is the prevention of crime." *Watseka*, 796 F.2d at 1551. The Town submits several affidavits from residents stating they are concerned about the *possibility* of crime in their neighborhoods. (Comp Aff. ¶ 10; Baize Aff. ¶ 10; Affidavit of John Parker ("Parker Aff.") ¶ 6; Stagge Aff. ¶ 10). Without referencing any specific events, evidence, or statistics, these residents state there have been "burglaries of homes" and an "increase in home invasions in communities, like Yorktown." (Stagge Aff. ¶ 10; Parker Aff. ¶ 6). These unsubstantiated fears and worries of a handful of residents are not

sufficient to show the Ordinance is narrowly tailored. *See Watseka*, 796 F.2d at 1556 ("Such a conclusory assertion by an interested party, particularly when unsupported by any statistics or firsthand knowledge of any actual crimes, lends little if any support to [the city's] claim."); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000) (stating the Court has "never accepted mere conjecture as adequate to carry a First Amendment burden"); *Teterud v. Burns*, 522 F.2d 357, 361-62 (8th Cir. 1975) ("Justifications founded only on fear and apprehension are insufficient to overcome rights asserted under the First Amendment.").

Without any substantive evidence establishing an increase in the crime rate due to door-to-door solicitation, the Town fails to show how canvassing after sunset but before 9:00 p.m. poses any greater threat to its citizens than any other person who may come to a resident's door after dark. *See Watchtower Tower*, 536 U.S. at 169 (rejecting Village's argument that its ordinance served the interest of preventing crime because it "failed to present any evidence of its own crime rate", "failed to offer any evidence of its crime rate between 5 p.m. and 9 p.m.", and "failed to in any way link the evidence on nighttime crime to solicitation"); *Watseka*, 796 F.2d at 1555 (noting that the city's evidence concerned crime happening after dark, not between 5 p.m. and 9 p.m., and thus failed to link evidence of nighttime crime to solicitation). The Town's concern about an increase in the incidence of crime that could result from door-to-door solicitation is adequately addressed through the Town's enforcement of Indiana's criminal laws against trespass, theft, and the like. The Town's Ordinance is, therefore, not narrowly tailored to protect its residents against crime.

### 3.    Safety of Canvassers

Finally, the Town claims it has a legitimate interest in protecting the safety of canvassers. Specifically, the Town points to the lack of sidewalks and street lights in its neighborhoods, along with the remote layout of the Town, which combine to create dangerous conditions for canvassers. (*See, e.g*., Drummond Aff. ¶ 5 (testifying that it is very hard to see pedestrians in his subdivision at night because of the dark); Comp Aff. ¶ 5 (same); Baize Aff. ¶ 5 (same); Stagge Aff. ¶ 5 (same)).

Though it is a laudable cause to protect canvassers at night, the Town again failed to set forth any substantive evidence that the Ordinance is narrowly tailored to ensure their safety. The Hours Restriction applies to only one type of pedestrian – the canvasser – and fails to account for residents who walk their dogs, or walk or jog for exercise. Courts in other jurisdictions have struck down ordinances that set forth a similar justification. *See, e.g., New Jersey Envtl. Fed'n v. Wayne Twp.*, 310 F. Supp. 2d 681, 696 (D.N.J. 2004) (rejecting city's argument that the curfew was necessary to protect canvassers from traffic incidents due to a lack of streetlights and sidewalks because the curfew only applied to canvassers who solicit for donations or sales, and not to all canvassers); *New Jersey Envtl. Fed'n v. Monroe Twp.*, 2008 WL 2982598, at * 7 (D.N.J. 2008) (rejecting city's argument that ban prohibiting canvassing after 6 p.m. furthered its interests in keeping canvassers safe because it was a "semi-rural community without an extensive network of sidewalks and street lighting").

The Town's legitimate interest in protecting the safety of canvassers can be better served by less intrusive measures than prohibiting canvassing after sunset. The Town

Council could pass an ordinance requiring canvassers to wear reflective clothing, carry a flashlight, and stay within a certain distance from the side of the road. *See, e.g., New Jersey Envtl. Fed'n v. Wayne Twp.*, 310 F. Supp. 2d 681, 696 (D.N.J. 2004) (finding city's legitimate interest in protecting safety of canvassers could be better served by less intrusive measures than banning canvassing after dusk, such as requiring canvassers to wear reflective clothing or carry flashlights); *New Jersey Envtl. Fed'n v. Monroe Twp.*, 2008 WL 2982598, at * 7 (D.N.J. 2008) (stating less restrictive ways are available for addressing safety concerns of canvassers rather than banning canvassing after darkness). Ironically, CAC's canvassers are already trained to engage in these safety measures. The court therefore finds the Ordinance is not narrowly tailored to meet the Town's legitimate government interest of protecting the canvassers.

### B.    Ample Alternative Channels of Communication

Since the Ordinance is not narrowly tailored to meet the Town's legitimate government interests, the court need not evaluate whether the Ordinance provides ample alternative channels of communication. *See Weinberg*, 310 F.3d at 1040 (stating it was not mandatory to discuss other constitutional requirements of a time, place, and manner restriction after finding ordinance did not advance a significant governmental interest). Nevertheless, for sake of completeness, the court will also evaluate this prong.

The Seventh Circuit stated that "[s]o long as the amount of speech left open is ample, it is not fatal that the regulation diminishes the total quantity of speech." *Watseka*, 796, F.2d at 1553; *see also Kenosha*, 767 F.2d at 1256 ("The government should also show that the alternatives to the prohibited activities are ample and adequate."). In

making this determination, the court considers whether the alternative is ample from the speaker's point of view. *Weinberg*, 310 F.3d at 1041. Specifically, the court looks at the "methods of communication and asks whether those methods not prohibited by challenged regulation are equivalent to prohibited methods." *Kenosha*, 767 F.2d at 1254 fn. 3. An adequate alternative, however, "does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Gresham*, 225 F.3d at 906 (citations omitted). But an alternative must be more than merely theoretically available; it must be realistic as well. *Id.* Indeed, the Supreme Court has displayed special concern "for some forms of expression that are much less expensive than feasible alternatives." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 n. 30 (1984). Lastly, an adequate alternative "cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.* at 907. With these principles in mind, the court turns to the alternative methods of communication set forth by the Town: (1) canvassing on the weekends; and (2) social media.

### 1. Weekends

According to the Town, nothing in the Ordinance prevents CAC from canvassing during the daylight hours on Saturdays and Sundays. Calculating the daylight hours of Saturdays and Sundays from April 16 to October 25, 2013, the Town cites to 920.5 hours that CAC could be canvassing, but is not. The Town reinforces this point with affidavits from several residents stating they would be willing to talk to someone at their door

during the daylight hours of a weekend. (*See, e.g*., Affidavit of Rebecca Deanda ¶ 9; Drummond Aff. ¶ 6; Hurley Aff. ¶ 5; Affidavit of Carolyn Grieves ¶ 3).

Simply pointing to a different time when CAC may communicate its message does not end the analysis "if the intended message is rendered useless or is seriously burdened." *Weinberg*, 310 F.3d at 1041; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) (finding that alternative to post sign on commercial as opposed to residential property was inadequate because residents may wish to reach neighbors). Forcing CAC to canvass on the weekend instead of the prime hours of canvassing – 7:00 p.m. to 9:00 p.m. Monday through Friday -- would seriously burden its message and purpose.

First, it is misleading for the Town to simply calculate the number of hours available for canvassing on the weekends throughout the year and claim those hours are comparable with the hours before 9:00 p.m. that are restricted by the Ordinance. As CAC's data shows, each hour of canvassing is not created equally. CAC is far more successful in conveying its message and collecting donations weekdays after 7 p.m. than it has been during the limited time it has canvassed on the weekends.

Second, and most importantly, the constitutionality of the Ordinance does not hinge on how effective CAC is in canvassing on the weekend. *See Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939) (stating "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"). The issue here is where the prohibition of canvassing after sunset on weekdays is constitutional, not whether CAC is effective at soliciting at some other time. *See Association of Community Organizations for Reform Now v. City of*

*Frontenac*, 714 F.2d 813, 819-20 (8th Cir. 1983); *Citizens for a Better Env't v. Vill. of Schaumburg*, 590 F.2d 220, 224 (7th Cir. 1978) (stating the fact that non-profit could contact citizens through other methods was not relevant to the First Amendment challenge); *Citizens for a Better Env't v. Vill. of Olympia Fields*, 511 F. Supp. 104, 106 (N.D. Ill. 1980) (stating "the availability of Saturday hours and alternate modes of communication is not particularly pertinent to plaintiffs' attack upon defendants' time restrictions"). Accordingly, the use of Saturday and Sunday to canvass is not an adequate alternative for CAC.

### 2. Social Media and E-Mail

Lastly, the Town argues various forms of social media, including Facebook, Google Plus, and Twitter, are ample and adequate alternatives to the prohibitions set forth in the Ordinance. Specifically, the Town argues that a "communications revolution" has taken place since relevant precedent has been decided concerning time restrictions on soliciting, and that if these new modes of communication were to be considered by the courts today, the Town's time restrictions would be deemed constitutional.

According to CAC, there are special advantages of speaking with someone face-to-face that cannot be replicated over the internet. (K. Olson Aff. ¶ 12; K. Olson Supp. Aff. ¶ 6; Sucec Supp. Aff. ¶ 9); s*ee also Riley v. National Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 790-91 (1988) ("The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it."). The Seventh Circuit also acknowledged that when the Supreme Court granted protection to door-to-door solicitation and canvassing, it "implicitly recognized that door-to-door

communication has a special significance not duplicated by less personal forms of contact." *Watseka*, 796 F.2d at 1558. The court agrees that the ability to engage in conversations, have petitions signed, answer questions, and distribute literature all in one setting, cannot be replicated over the internet. Accordingly, the court does not find social media and e-mail are adequate alternatives.

In sum, the Ordinance is neither narrowly tailored to the Town's legitimate government interests, nor does it provide ample alternative methods for CAC. Accordingly, the Ordinance cannot survive constitutional scrutiny on its face or as applied.

**IV.    Conclusion**

For the reasons set forth above, CAC's motion for summary judgment (Filing No. 39) is **GRANTED**, and Defendants' cross motion for summary judgment (Filing No. 41) is **DENIED**. Accordingly, the court enters judgment for Plaintiff and thus permanently enjoins Yorktown's enforcement of the Ordinance.


**SO ORDERED** this 30th day of September 2014.

RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.